| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SUPERIOR OFFSHORE** | § | **CASE NO. 08-32590-H2-11** |
| **INTERNATIONAL, INC.** | § | **(Chapter 11)** |
| | § | |
| **Debtor.** | § | |
| **SUPERIOR OFFSHORE** | § | |
| **INTERNATIONAL, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Adversary No. 11-**__3117_____ |
| | § | |
| **LOUIS E. SCHAEFER, JR.,** | § | |
| **JAMES J. MERMIS, ROGER D. BURKS,** | § | |
| **and JOSHUA KOCH,** | § | |
| | § | |
| **Defendants.** | § | |

## COMPLAINT

Superior Offshore International, Inc. ("Superior" or the "Debtor"), by and through the Post-Confirmation Equity Committee ("PCES") created pursuant to the confirmed First Joint Chapter 11 Plan of Liquidation (the "Plan"), files this Complaint against Louis E. Schaeffer, Jr., James J. Mermis, Robert D. Burks and R. Joshua Koch (collectively, the "Defendants").

### PARTIES AND JURISDICTION

1.      Superior is the debtor-in-possession in this bankruptcy case.  The PCES was granted authority to pursue the claims set forth in this Complaint under the Plan on behalf of Superior.  The PCES may be served through the undersigned counsel.

2.      Louis E. Schaefer, Jr. ("Schaefer") was the founder of Superior and served as its Chief Executive Officer and managing member until approximately August, 2006.  Thereafter, Schaefer served as the chairman of the Board of Directors until his departure from the company

1

in November, 2007.  Schaefer may be served with this complaint and a summons at his residence located at 2210 Twin Oaks Boulevard, Kemah, Texas 77565.

3.     James J. Mermis ("Mermis") was Superior's Chief Operating Officer and vice president of operations from February, 2005 until January, 2006.  Thereafter, Mermis served as President and/or Chief Executive Officer until his departure from Superior in January, 2008. Mermis was also a member of the Board of Directors.   Mermis may be served with this Complaint and a summons at his residence located at 5406 Sundowner Court, Houston, Texas 77041.

4.     R. Joshua Koch, Jr. ("Koch") served as Superior's Executive Vice-President, General Counsel and Secretary from approximately May, 2006 through October, 2007.  Koch was also a member of the Board of Directors during such time.  Koch may be served with this Complaint and a summons at his residence located at 610 Grecian Way, Houston, Texas 77024.

5.     Roger D. Burks ("Burks") served as Superior's Chief Financial Officer from approximately December, 2006 through March, 2008.  Burks was also a member of the Board of Directors during such time.   Burks may be served with this Complaint and a summons at his residence located at 75 North Royal Fern, The Woodlands, Texas 77380.

6.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

8.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Relief is sought pursuant to 11 U.S.C. § 544 and other applicable law.

### SUMMARY OF THE COMPLAINT

9.     By this adversary proceeding, the Plaintiff seeks to recover money damages against the Defendants caused by their multiple breaches of their fiduciary duties of care, loyalty,

and good faith they owed to Superior, and their waste of corporate assets, self dealing, and diversion of corporate opportunities. In addition, Plaintiff seeks disgorgement of illegal insider trading proceeds, attorneys' fees, costs and interest in accordance with applicable law. Defendants' actions caused the loss of over $385 million in enterprise value and the loss of over 600 jobs when Superior sought bankruptcy protection exactly one year and four days following its initial public offering on April 20, 2007 (the "IPO").

<u>STATEMENT OF RELEVANT FACTS</u>

10.     Prior to its bankruptcy filing, Superior provided subsea construction and commercial diving services to the oil and natural gas exploration industries. Following Hurricanes Katrina and Rita in August/September 2005, Superior began to grow exponentially in an effort to capitalize on the increased workload in the Gulf of Mexico ("GOM"). In the 15 months prior to its IPO: (i) revenues increased three fold from $82.4 million to $243.4 million; (ii) the number of offshore employees increased from approximately 60 to over 600; (iii) its vessel fleet more than quadrupled -- from owning just two vessels in 2005 to acquiring or chartering an additional seven vessels between March 2006 and March 2007; and (iv) Superior acquired South Africa based Subtech Diving and Marine ("Subtech").

11.     In the spring of 2006, Schaefer began to explore taking Superior public in order to realize the value of his then ownership of the Debtor. As stated in an email dated November, 1, 2006 from one of the underwriters to Superior's outside counsel, the primary purpose of Superior's IPO was to benefit Schaefer who had "his sights on putting a big chunk of money in his pocket."

12.     In March 2007, as the IPO process neared completion, an email communication dated March 3, 2007 authored by one of the Debtor's advisors stated that to "execute its business

plan" Superior <u>needed at least "$45 million of IPO [to] remain at the Company</u>." (emphasis

added).  This $45 million net figure to remain at Superior (after all debts and expenses were

paid) was also reflected in Superior's IPO due diligence presentations in late March, 2007.  In

addition, the due diligence presentations reflected a capital expenditure budget for fiscal year

2007 of $102 million and a cost structure (defined as cost of revenues + operating expenses) of

over $232 million (most of which were fixed) compared to $169 million for the previous fiscal

year ended December 31, 2006.

13.    However, beginning several months prior and continuing through the IPO,

Superior's actual business activity in the Gulf of Mexico had been deteriorating dramatically. As

admitted in numerous internal emails they authored or received, the Defendants knew as early as

late 2006 that demand for Superior's 4 point vessels, which were limited to operating in the

GOM, was plummeting because Superior's pricing structure was substantially higher than its

competitors.

14.    For example, a survey performed in connection with a General Manager's

Meeting held on October 5, 2006, reflects Superior's prices were 30-40% higher than its

competitors.  In addition, an email sent on January 19, 2007 to Mermis, Burks, and Koch states

that Moody's -- which was performing a rating analysis on Superior's proposed $110 million

Term Loan B with JP Morgan -- had heard "from quite a few other service [companies] that the

[market] is softening."   Similarly, an email dated February 12, 2007 sent to Mermis from

Superior's operations department reflected that Superior was losing business because its pricing

was too high.  This is also confirmed by an email sent to Mermis on April 4, 2007 that stated that

Superior's potential client was "taken aback at [Superior's] price difference" as Superior's

competitors day rate quotes were $10,000 less per day.  Another email dated April 17, 2007 from

Mermis to Koch and Burks reflected that Superior could not "win work" because its pricing for 4 Point vessels was far higher than its competitors in terms of lease price.

15.     Further illustrating the Defendants' knowledge of the continuing deterioration in Superior's business in the GOM, is the alarm expressed by Koch to Mermis and Burks in an email dated April 16, 2007 -- four days prior to the IPO -- in which Koch exclaimed that after talking with Burks he was ***"concerned over the revenue numbers!"*** because at least three of Superior's five 4 Point vessels "were sitting at the dock" because their "rates [were] too high while [Superior] still incur[ed] the same overhead and costs" and that overall demand was low.

16.     The Defendants also knew prior to the IPO that Superior would require significant additional proceeds from the IPO because Superior's second quarter ended June 30, 2007 results ("2Q07") would be negatively impacted due to huge unbudgeted expenses in connection with the *Superior Endeavor's* refurbishment.   These additional costs were not in the Debtor's pre-IPO budget. For example, as reflected in internal documents, the Defendants knew in March 2007 -- a month prior to the IPO -- that it had been discovered that the *Superior Endeavor* was rife with asbestos which would have to be remediated.   The remediation actually cost $2.6 million in 2Q07, an amount that was not in Superior's budget.   In addition, by late March 2007 (i.e. well prior to the IPO), the Defendants (i) had determined to change the six man saturation system on the *Superior Endeavor* to a twelve man saturation system which would result in an additional $5 million of cost overruns in 2Q07; and (ii) knew the *Superior Endeavour* was "in worse condition than originally projected" especially with faulty pipes and electrical wiring which alone would cost more than $4.7 million to fix.   The Defendants knew that these two issues also were not accounted for in Superior's budget and would materially and negatively impact Superior in the

form of both: (i) higher expenses; and (ii) lost revenues caused by the further delay in the deployment of the *Superior Endeavour*.

17. The Defendants also knew that Superior's accounting and project management controls were in a shambles. At the time of the IPO: (i) Superior employed only one degreed accountant; (ii) used predominantly manual processes for revenue, payment, and consolidation functions; (iii) had no designated individual whose sole responsibility was to be the Controller; (iv) had no internal financial reporting capability; and (v) had no internal audit function. Superior's auditor, KPMG, informed the Defendants that Superior's "controls related to the revenue, payroll, and disbursement processes throughout 12/31/06 year end audit. . . . were not operating effectively" -- a conclusion that remained unchanged in KPMG's review of Superior's first quarter results ended March 31, 2007 and beyond.

18. For example, just prior to the IPO, internal communications, which included Mermis, Koch, and Burks, reflect that more than 771 third-party invoices totaling more than $3.29 million had been discovered but which had not been input into the Superior's accounts payable system and for which no purchase order had been issued. With respect to the refurbishment of the *Superior Endeavour* and other projects, Defendants also knew that Superior (i) had no formalized project management procedures to monitor progress and costs; (ii) had no way to monitor costs and cost overruns because supplemental Authorizations For Expenditure processes and forms were not issued and provided to management; and (iii) had no process for tracking invoices submitted to Superior or ensuring that such invoices were supportable.

19. With KPMG attempting to complete its audit of Superior's books, Superior hired Deloitte & Touche LLP ("Deloitte") in the beginning of 2007 to take Superior's decentralized, antiquated/manual operations and design a new Superior from the ground up. Deloitte became

responsible for designing Superior's essentially nonexistent IT functions covering every aspect of its business; its Quality, Health, Safety and Environment ("QHSE") functions; and its accounting, internal, and project management control functions.  In addition,  Deloitte also was responsible for designing Superior's internal control systems to comply with  the requirements of the Sarbanes Oxley Act of 2002 and, in particular Section 404 of the Act relating to the effectiveness of Superior's internal control over financial reporting.  Those controls included basic functions regarding entity level controls, revenues, expenditures, job costing, inventory, and financial reporting in which Deloitte identified over 176 "gaps" or deficiencies.  Indeed, so dysfunctional were these controls that, by August 13, 2007, Deloitte had only been able to remedy 38 out of the 176 identified "gaps".

20.     Lastly, prior to the IPO and in addition to the foregoing facts described above, the Defendants were also aware of a number of other risks facing Superior further requiring that it net $45 million from the IPO in accordance with its business plan to be properly capitalized.  For example, Superior (i) had no experience in managing a company that had grown in 15 months from approximately 60 offshore employees to well over 600 offshore employees; (ii) faced significant financial risk given Superior's declining business and the minimum capital required to meet its $102 million capital expenditure budget for fiscal year 2007 and fund the construction of the *Superior Achiever,* financing which Defendant Burks noted in an email to Defendant Koch, dated March 28, 2007, needed to be done "as soon as the ipo [was] over"; (iii) was small in comparison to its competitors; (iv) faced significant operational risk as Superior's growth had been driven by single occurrence events, Hurricanes Katrina and Rita in 2005; (v) lacked sufficient management experience; (vi) had its operations concentrated primarily in the GOM, an extremely cyclical business sector; and (vii) would have to carry an extremely high level of debt.

21. Incredibly, despite their knowledge of the conditions discussed above, rather than shore up Superior's capital structure, the Defendants allowed Schaeffer to increase his take from the IPO to over $70 million -- at the expense of Superior. The Defendants breached their fiduciary duties to Superior by authorizing, in two sham board meetings, a $28 million special dividend payable by Superior to Schaefer and making it possible for Schaefer to sell an additional $21 million stock *at Superior's expense*. Schaefer conducted much of his activity through Schaefer Holdings, LLC, in which Schaefer was the sole member and in which Koch was the sole manager. Schaefer Holdings, LLC was the General Partner of Schaefer Holdings LP ("Schaefer Holdings"). Mermis and Koch were also "interested" in this transaction as limited partners in Schaefer Holdings with each having a 2% interest in Schaefer Holdings valued at nearly $1 million each as a result of the IPO. Schaefer, Mermis and Koch were three of the four members of the Superior Board at the time, with the fourth being Burks.

22. Specifically, on April 16, 2007, the Defendants authorized Superior to pay Schaefer and Schaefer Holdings $28 million in the form of a special dividend out of the proceeds Superior was to receive from the IPO. On April 19, 2007, the Defendants learned that the IPO was ten times oversubscribed by institutional investors. Rather than allowing Superior to benefit from this increase in demand by selling more shares on the IPO, the Defendants, for their own personal benefit, restricted the amount of capital going to Superior from the IPO and gave 100 percent of the "upsized" benefit of being able to sell an additional 1.5 million shares to Schafer and Schaefer Holdings. The Defendants also gave Schaefer -- rather than the Superior -- the benefit of selling an additional 225,000 shares if the underwriters exercised their overallotment option, as they did.

23.     Both board meetings were shams with Schaefer controlling the Board's decisions to benefit himself, Mermis and Koch.  Burks, who had just started at Superior in December 2006, like Mermis and Koch, owed his employment and livelihood to Schaefer.  As reflected in a March 1, 2007 email drafted by Superior's counsel, it was Schaefer who would decide "***how much he wants out of the Company or, said another way, how much money he wants to leave in the company.***"  Another email from Koch to counsel dated April 19, 2007 reflects that the entire allocation of shares sold in the IPO was controlled by Schaefer at his "option."

24.     In the end, Schaefer and Schaefer Holdings sold 3.025 million shares in the IPO for proceeds in excess of $42 million and took $28 million from the Company by means of a special dividend for a total take from the IPO exceeding $70 million -- leaving the Debtor with just $17.9 million in available funds (after payment of expenses and debt).

25.     As a result, rather than receiving the expected $45 million from the IPO needed to execute its business plan, the Superior received $27 million less.  Thus, the Defendants knowingly left Superior woefully undercapitalized in light of the known adverse facts and risks concerning its business as well as its $102 million FY 2007 capital expenditure plan and $232 million FY 2007 cost structure.

26.     Given the foregoing material adverse information known by the Defendants prior to the IPO, the Defendants could not reasonably rely on continued easy access to the credit markets (which required, *inter alia*, lower debt to EBITDA ratios than Superior could reasonably expect) or on Superior's cash flows and therefore knew the Debtor could not afford to waste needed capital to enrich Defendant Schaefer as well as Defendants Mermis and Koch through their interests in Schaefer Holdings.  Indeed, concerns about the Company's undercapitalization led Burks to ask Schaefer just prior to the IPO ***to leave at least $25 million more money in the***

*Company* -- a request rebuffed by Schaefer -- and subsequently unchallenged by Burks. That fact was confirmed by an admission by Burks to a high level executive at Superior a few days after the IPO who had been surprised to learn that Superior had not netted the $45 million in capital from the IPO as called for in Superior's business plan.

**Superior's First Quarterly Results as a Public Company are a Disaster and Defendants Mermis, Koch, and Burks Engage in Insider Trading.**

27.     Consistent with Koch's pre-IPO April 16, 2007 email exclaiming his "concern[] over the revenue numbers!", the earlier emails discussing Superior's loss of 4-point vessel business in the GOM because of its uncompetitive prices, and the known unbudgeted repairs/changes to the refurbishment of the *Superior Endeavour*, Superior's April, 2007 actual financial results sent to Defendant Burks in an email dated May 25, 2007 (less than five weeks after the IPO) further reflected exactly why Burks had asked Schaefer to leave an additional $25 million with Superior from the IPO. That email revealed that Superior's April financial results were terrible -- revenues were $15.1 million versus a projected $19.3 million and EBITDA was a *negative $2.56 million* versus a projected positive $3.39 million.

28.     In addition, due to the lack of capital to Superior following the IPO, Burks became desperate to close on the secured loan facility that Superior had been negotiating with Fortis since November 2006. However, rather than the $110 million loan previously provided by JP Morgan, the Fortis loan was capped at $60 million -- an amount woefully insufficient to complete Superior's capital expenditure plan for FY 2007 -- with an additional $40 million available only if Superior "enter[ed] into a long-term, non-cancellable charter . . . for the *Superior Achiever*, on terms acceptable to [Fortis]." Lastly, the Fortis loan had multiple debt, asset and EBITDA covenants which as detailed below, Superior began violating in the very next quarter. Emphasizing the urgency of Superior's need for cash as a result of its

undercapitalization, on June 19, 2007, Burks sent an email to Fortis stating "GET THIS DONE" (all caps in original). The loan agreement was finalized the next day and Superior immediately drew down $25 million on that loan -- further demonstrating the precariousness of its financial condition.

29.     In late July, 2007, the Defendants knew that Superior's results for the second quarter ended June 30, 2007 were a disaster. Among other things revenues, EBITDA was well below projections and Superior would be in violation of certain covenants on its credit facility with JP Morgan -- including its Fixed Charge Coverage Ratio defined as EBITDA minus the unfinanced portion of capital expenditures divided by certain fixed charges including principal payments, taxes, and capital lease obligations. JP Morgan agreed to waive Superior's covenant violation in 2Q07 and further agreed to lower the Fixed Charge Coverage Ratio covenant to .8 - 1.0 from 1.0 - 1.2 for 3Q07. However, before JP Morgan agreed to do that, on August 2, 2007, Burks received an email from the outside firm that handled Superior's financial reporting with projections showing that Superior would not even be able to meet the lowered Fixed Charge Coverage Ratio of .8 - 1.0 in 3Q07. Specifically, those projections reflected that Superior's Fixed Charge Coverage Ratio was projected to be .59 in 3Q07.

30.     Superior's problems, however, did not end there. In July 2007, Superior discovered that it had improperly accounted for tax payments related to its foreign flag vessels which operated in U.S. waters. On August 6, 2007, Burks received a draft memorandum on this issue from the outside consultants who prepared Superior's financial statements which concluded that Superior owed the IRS $11.3 million excluding penalties and interests. The depth of Superior's problems were further revealed in an email dated August 8, 2007 between members of the banking team at JP Morgan Chase responsible for Superior's credit line following

conversations with Superior's management. Among, other things, the email stated that: (i) "The company has poor financial management . . . [is] managing huge growth . . . . and [has] found a lot of discrepancies and could find more"; (ii) Superior had improperly swapped $20 million in eligible foreign receivables as collateral for its credit line over the past six months which made the Debtor's "borrowing base availability tight"; (iii) Superior had been forced to draw $10 million down from the Fortis loan for working capital -- as opposed to its intended purpose of capital expenditures -- "so there may no longer be sufficient funds to finish the [*Superior Achiever*] from Fortis"; (iv) Superior had improperly accounted for taxes under an "old contract" and "may owe the IRS about $9 million." The email noted further that the credit manager at JP Morgan Chase "was considering a default letter" but that JP Morgan Chase bankers wanted to have that letter held because it "need[ed] to 'hang with them' for reputation risk issues [because] . . . we took them public early this year.

31. On August 14, 2007, Superior announced its disastrous results for 2Q07. Among other things, Superior reported: (i) total quarterly revenues of $41.9 million compared with revenues of $60.6 million in the second quarter of 2006; (ii) a net loss of $10.8 million for the quarter, or $0.50 per share compared with net income of $12.1 million, or $0.82 per diluted share, in the second quarter of 2006; and (iii) EBITDA of a negative $11.7 million compared with a positive $19.5 million in the second quarter of 2006. Superior publicly cited both the increased expenses and delays in connection with the refurbishment of the *Superior Endeavour* and the underutilization of its 4 point vessels and "***pricing pressure***" on day rates for those vessels as the primary causes of the 2Q07 debacle.

32. However, no mention was made of Superior's poor financial management which caused the improper use of $20 million in foreign receivables as collateral on Superior's credit

line, or that because Superior was so short of cash it had to use the Fortis loan to fund its operations which left insufficient funds to allow for the completion of the *Superior Achiever*. Lastly, with respect to the potential tax liability of $11.3 million due to the improperly accounted for tax payments related to its foreign flag vessels which operated in U.S. waters Superior only disclosed a tax liability and payment of $980,000 to the IRS. However, that payment only related to the tax liability incurred on a single vessel, the Mansal 18. Defendants made no disclosures about Superior's other vessels which potentially resulted in a potential tax liability exceeding $11 million.

33.    In addition, another email dated August 20, 2007 reflects that Mermis admitted shortly before that date that Superior was "looking at a cash flow problem" -- which was also not public information. Lastly, another email from Koch to Burks and Mermis dated August 20, 2007 reflects that Superior was having such serious liquidity issues that it did not have the cash to pay its contractual commitments to Subtech -- which exceeded $28 million. In that email Koch stated "if possible, pay them . . . perhaps a million with set dates on which to pay the remainder" but that "at present [Superior was] *in breach of our contract with them.*"

34.    Despite knowing this material adverse information that was not publicly revealed in connection with Superior's 2Q07 financial results, Mermis, Koch, and Burks filed 10b5-1 trading plans with the SEC on August 21, 2007 to begin selling all of their personal holdings of vested Superior stock on October 25, 2007 -- as soon as the six month lock up period following the IPO ended.

35.    Shortly thereafter Defendant Burks began emailing his resume to recruiters.

**Superior's UnderCapitalization and Internal Control Issues Continue To Plague It and Mermis and Burks Further Breach Their Fiduciary Duties In Connection With The Sale Of The *Superior Achiever*.**

36.     Superior's liquidity crisis caused by its undercapitalization from the IPO continued to worsen.  In late September, 2007 Superior advised Fortis that it would miss the third quarter revenue projections it had given Fortis just a month before and that it would violate the Consolidated Leverage Ratio and Consolidated Interest Coverage Ratio as of the quarter ended September 30, 2007.

37.     At the same time, Defendants hired Tudor Pickering Holt & Co. to advise them on raising capital or strategic alternatives. In addition, Superior sought a waiver of the covenants from Fortis in October 2007 and also sought to increase the unrestricted loan amount from $60 million to $80 million because the current financing did not supply Superior with enough funds to complete the *Superior Achiever*.  Fortis refused Superior's requests and advised Superior that the only waiver Fortis would provide was to allow the Debtor to obtain a commitment for replacement financing by November 30, 2007 and close on that financing by December 21, 2007.  If these conditions were not met, Fortis told Superior that it was prepared to accelerate the $55 million outstanding on the loan to be currently due -- a disastrous prospect for Superior since it did not have sufficient cash or liquid assets to satisfy that debt.  Replacing the Fortis loan, therefore, became critical.

38.     On October 22, 2007, Koch resigned as an officer and director of Superior effective November 2, 2007.

39.     Meanwhile, Superior's lack of adequate accounting and project management controls materially and adversely impacted its relationship with its largest customer, BP Trinidad and Tobago LLLC ("BPTT").   Superior began work on the BPTT project in July 2007.

However, by mid-October 2007, BPTT began demanding credits on over $10.5 million in invoices sent by Superior out of a total of $83.9 million in invoices because of improper and disputed billing practices brought about in large part because of the Debtor's lack of accounting and project management controls. Further illustrating Superior's accounting/project management control deficiencies, as acknowledged during a "Strategic Planning" meeting held on October 26, 2007 that included among others, Burks and Mermis, Superior had missed making $6 million in re-bills. The conclusion from that meeting was: "Bottom line -- material weakness in internal controls." Notably, at that meeting, it was also stated that "Job accounting [does] not reflect all revenues, costs, and profit accurately or consistently."

40.     On October 31, 2007, Thomas Daman, Superior's VP of Finance, signed a loan proposal with AIG Commercial Equipment Finance ("AIG") in connection with a proposed $80 million Senior Secured Credit Facility which Superior needed to replace its term loan with Fortis. In connection with AIG's consideration of whether to provide a commitment to provide the financing, Daman sent AIG projections that included Superior's projected October 2007 EBITDA of $7.9 million (not including a projected stock compensation expenses).

41.     On November 12, 2007, in furtherance of its consideration of committing to the financing, AIG requested the actual October EBITDA and Revenue results. That same day, Superior controller left a voicemail with John Benoit of AIG stating that preliminary estimates for October 2007 revenues and EBITDA were $32.5 million and $3.3 million, respectively -- well below the projected EBITDA of $7.9 million.

42.     Benoit immediately asked Superior for an explanation of this huge shortfall in EBITDA. As Superior scrambled to address this issue internally, the controller sent an email to Burks stating that the wrong "gross margin" rate of 41% had been used in making the $7.9

million EBITDA projection given earlier to AIG and that the gross margin should have been 20%. The email also states that "we could make as much as a 27% margin which would give a revised EBITDA of $5.575 million" -- still well below the projected adjusted EBIDTA of $7.9 million and the incorrect gross margin of 41%. Afterwards, the revised $5.575 million EBIDTA figure was communicated to Benoit.

43.     On November 30, 2007, AIG issued a commitment letter for the $80 million credit facility -- secured by the *Superior Achiever* -- and which also cost Superior a $500,000 commitment fee. The AIG commitment letter included provisions allowing AIG to withdraw from its commitment and keep the $500,000 commitment fee if it learned of a "material adverse change" in Superior's financial or business condition prior to the closing.

44.     On November 14, 2007, Schaefer resigned from Superior as its Chairman of the Board of Directors.

45.     Recognizing that Superior's financial condition might cause AIG to withdraw from making the loan, Mermis and Burks began shopping the *Superior Achiever* in mid-November without the knowledge of Superior's board of directors. Because the *Superior Achiever* was the principal source of collateral for the AIG $80 million loan, Burks and Mermis knew that the Debtor's sale of that assert would void the commitment with AIG.

46.     Demand for the *Superior Achiever* was high, in large part, because it was scheduled to soon be operational in mid-to-late 2008 compared to over a three-year backlog in the production of similar vessels. As reflected in an email dated November 26, 2007, sent by Thomas Daman to Burks and Mermis, the current fair market value of the *Superior Achiever*, configured with the planned saturation diving capability and two remote operated vehicles ("ROVs"), was approximately $160 million. And, the fair market value of the *Superior*

*Achiever*, less the saturation diving capability and the two ROVSs was approximately $132.8 million. However, Superior's cost to complete the *Superior Achiever* without the saturation diving system and the ROVs was just $106 million. Thus, the increase in the fair market value from the contracted price was approximately $26.8 million or 25.3% above the contracted price.

47.     Multiple parties expressed an immediate interest in a sale/leaseback arrangement for the *Superior Achiever* or an outright purchase of it. For example, on November 26, 2007, James Apps, a broker from Derrick Offshore Ltd., sent an email to Burks and Mermis stating that RS Platou was willing to close on a deal in 2007 that would pay Superior an initial payment equaling whatever amount Superior had paid the shipyard to date (which would be enough to repay the Fortis loan in full) and the balance upon completion of the *Achiever*, for a total purchase price of $155 million (less a 1.5% commission). The proposal also included a 10-year leaseback charter at a day rate of $49,250 per day, which would have allowed Superior to make use of the ship as planned. This offer represented a profit to Superior of approximately $22 million.

48.     On December 4, 2007, Eidesvek Shipping, SA communicated a firm offer to Mermis and Burks of $135 million for the *Superior Achiever* (less a 1% commission) without the saturation diving system or the ROVs (configured just as the Hornbeck sale discussed below) and higher than the fair market value of $132.8 million reflected in Thomas Daman's November 26, 2007 email to Mermis and Burks discussed above. Ten percent of the purchase price would be paid within 10 days of a memorandum of understanding being signed and the balance would be paid upon delivery of the vessel. In addition, the offer contained a leaseback term of 10 years with a daily rate of $73,000. Given that the vessel cost without the saturation diving system and

the ROVs was approximately $106 million, this represented nearly a $29 million profit to Superior

49.     On or about December 11, 2007, Superior sent its actual financial results for the month of October 2007 to AIG.  Those results revealed an EBITDA figure of $3.3 million -- the precise figure Superior's controller had first communicated to AIG on November 12, 2007.  On December 12, 2007, Burks and representatives of AIG held a conference call to discuss Superior's October 2007 monthly financial results.  During that call, Burks affirmatively conceded to AIG that the October 2007 EBITDA results had triggered the "material adverse change" clause in AIG's commitment letter -- thereby giving AIG the unequivocal legal right to withdraw from closing on the proposed $80 million financing.  Burks made this admission because he and Mermis had already negotiated the sale of the *Superior Achiever* to a Hornbeck Offshore Services, Inc. ("Hornbeck") -- eviscerating the loan agreement with AIG which was predicated on the *Superior Achiever* as security, but costing Superior the $500,000 commitment fee.

50.     On December 13, 2007, AIG sent Burks a letter stating that AIG was withdrawing from the loan commitment based, in part, on Burk's admission of a "material adverse change" in Superior's financial condition.  The next day, December 14, 2007, Burks and Mermis signed a letter of intent with Hornbeck to sell the *Superior Achiever* at a fire sale price of approximately $70 million -- an amount equal to the construction costs paid by the Debtor to date but not including $5.5 million in penalties/writeoffs the Debtor would incur as a result of having to terminate a separate contract to build the saturation diving system Superior had determined to add to the ship -- and a five year leaseback at day rate of $95,552.  This total consideration

agreed to in the sale to Hornbeck was thus well below the consideration previously offered by RS Platou and Eidesvek Shipping, SA.

51.     The agreement to sell the *Superior Achiever* to Hornback materially damaged Superior beyond the $5.5 million contract termination penalty/writeoff.  Specifically, pursuant to the Letter of Intent agreed to on December 13, 2007, Superior agreed to transfer to Hornbeck the realized gains of a currency hedge (dollar vs. euro) that it had entered into in November, 2006 since the *Superior Achiever* was being built at a Dutch shipyard.  As the euro had risen against the dollar, internal company documents reflect that this hedge was valued at approximately $2.9 million at the end of December, 2007.  Thus, Burks and Mermis actually entered into a Letter of Intent that provided for the sale of the *Superior Achiever* to Hornbeck for less than Superior's then contracted costs with the Dutch shipyard to construct the ship and far below its fair market value.

52.     Meanwhile, on December 14, 2007, unaware that Hornbeck had already signed a letter of intent to purchase the *Superior Achiever*, AIG told Burks it was quickly working on getting approval from AIG's headquarters for its own sale/leaseback proposal for the *Superior Achiever* which "[b]ased on current market information provided by [its] independent marine appraiser . . . [was a] highly desirable asset . . . [and] one that we would want to own".  Though AIG did not make a formal proposal to Burks because it learned of the deal with Hornbeck shortly afterwards, the proposal AIG intended to make would have immediately paid Superior $86 million -- $16 million more than Hornbeck -- and obviously an amount more than sufficient to allow Superior to pay off the Fortis loan, and AIG did not intend to cancel the saturation diving system so Superior would not have been subjected to a $5.5 million contract termination penalty/writeoff.

53.     On December 17, 2007, Burks and Mermis presented Superior's Board of Directors with only two options following AIG's withdrawal of the $80 million loan commitment on December 13: (i) the sale of the *Superior Achiever* to Hornbeck under the terms discussed above; or (ii) an offer to purchase the Fortis loan and make an investment in Superior by J.P. Knotts & Co. ("Knotts"). The Board of Directors instructed Burks and Mermis to attempt to renegotiate the terms of the Hornbeck purchase as well as to further explore the terms of the Knotts proposal.

54.     Burks and Mermis did not disclose to the Board the fact that other parties had made much better offers for the *Superior Achiever* before they signed the Letter of Intent with Hornbeck or that AIG had indicated it was in the final stages of approval for an offer to purchase it. Nor did Burks disclose subsequent offers for a sale/leaseback of the *Superior Achiever* made immediately *after* the terms in the letter of intent with Hornbeck were made public by the Company in a Form 8K filed on December 20, 2007. For example, on December 21, 2007, Dave Orth of American Marine Advisors ("AMA") sent an email to Burks stating that "if you'd like to entertain other sale/leaseback bidders or structures . . . for the *Achiever*, AMA would be interested . . . [and] we can meet the requirements of the Fortis waiver." It is reasonable to assume that AMA would have offered a better deal to Superior in a timely fashion given that it knew the terms of the Hornbeck deal and was still seeking to bid on the *Superior Achiever*. Burks did not respond to this invitation to bid nor did he inform Superior's Board of Directors of the inquiry.

**The Demise of Superior.**

55.     On January 7, 2008, unaware of any other interest in or offers to purchase the *Superior Achiever*, Superior's Board of Directors approved the sale of the *Superior Achiever* to

Hornbeck.  On January 8, 2007, Superior entered into an Asset Purchase Agreement (the "Agreement") with Hornbeck pursuant to which it agreed to sell the *Superior Achiever*.  Under the Agreement, Superior would receive approximately $70.0 million in cash, representing its approximate investment to date in the *Superior Achiever*.  In addition, Superior agreed to a five-year time charter for the *Superior Achiever* at $100,000 per day beginning on October 1, 2008.  Significantly, although the sale could not be completed until after the deadline Fortis had earlier imposed, Fortis extended its deadline so the sale could be consummated on January 22, 2008.

56.     On January 27, 2008, Mermis resigned as an officer and director of Superior.

57.     Meanwhile, Superior's dispute with BPTT over outstanding invoices continued to grow as Superior was unable to properly document and/or account for much of the disputed amounts.  In January 2008, BPTT offered to settle approximately $17 million in disputed receivables for a credit by Superior to BPTT of $7.1 million.  Conceding its inability to justify its prior billings, Superior offered to pay/credit BPTT $5.5 million in January 2008 -- which BPTT rejected.  Shortly thereafter, Superior wrote off $6 million in receivables for the year ended December 31, 2007 deeming them uncollectible. The BPTT dispute also materially and adversely impacted Superior's credit facility with JP Morgan -- upon which the receivables served as collateral for the borrowing base -- further restricting liquidity.

58.     On February 11, 2008, Burks resigned as an officer and director of Superior effective as of March 31, 2008.

59.     On April 1, 2008, Superior filed a Form NT 10K stating that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2007 within the prescribed time period because "management needs additional time to complete the financial statement review and approval process and needs to provide additional documentation to its independent

registered public accounting firm, KPMG LLP, in order to resolve certain pending items." Superior also stated that it was in "negotiations to obtain additional financing in order to address the [Company's] liquidity position" and that if Superior was unable to obtain adequate additional or alternate financing, KPMG would "issue an opinion expressing doubt about the ability of the [Company] to continue as a going concern."

60.     As Superior's financial condition continued its downward spiral, JP Morgan began demanding repayment of it the amounts outstanding on its credit facility.  Due to the ongoing financial turmoil proximately caused by the Debtor's undercapitalization following the IPO, Superior ceased operations and filed bankruptcy on April 24, 2008 -- one year and four days after its IPO.  The Defendants, however, did not fair so bad.  In total, they walked away with nearly $75 million from sales of Superior stock.

## COUNT I
### Breach of Fiduciary Duty - Duty of Care

61.     Plaintiff realleges paragraphs 1 through 60.

62.      As described above, prior to the IPO, the Defendants knew, among other things, that: (i) Superior's business was declining in the GOM due to declining demand in general and to its uncompetitive pricing structure and that this decline was getting worse as the date of the IPO approached; (ii) Superior would incur well over $10 million in unbudgeted cost overruns in 2Q07 in connection with the refurbishment of the *Superior Endeavour* which would also likely delay the *Superior Endeavour's* deployment thereby also costing Superior millions of dollars in lost revenues; (iii) Superior lacked functional accounting and project management controls to adequately monitor and/or account for revenues and expenses; (iv) Superior would have huge expenditures in fiscal 2007, including a $102 million capital expenditure budget and a $232 million cost structure; (v) there were glaring risks to Superior's ability to secure and maintain

adequate financing to carry out the capital expenditure plan following the IPO and to conduct its daily operations; (vi) Superior's business plan required that at least $45 million in proceeds from the IPO remain with Superior after all expenses and debts were paid.

63.     The Defendants breached their fiduciary duty of care and were grossly negligent when they approved: (i) the $28 million special dividend payable to Schaefer and Schaefer Holdings LP at the April 16, 2007 board meeting; (ii) granting Schaefer and Schaefer Holdings LP the entire benefit selling an additional 1.5 million shares in the "upsized" IPO as well as selling the entire 225,000 shares from the over-allotment option at the April 19, 2007 board meeting -- a benefit exceeding $21 million -- rather than directing the benefit to Superior.  As a result of those two decisions, Superior was materially undercapitalized when it received only $17.9 million in net proceeds from the IPO.  Burks' admission to a senior level executive that, just prior to the IPO, Burks had asked Schaefer to leave an additional $25 million from the IPO with Superior -- which Schaefer refused – reflects that the Defendants were grossly negligent in authorizing Schaefer, Mermis and Koch to loot Superior in the IPO.

64.     Had the Defendants acted in the best interests of Superior and not themselves, Superior would not have been undercapitalized; would have netted at least the $45 million from the IPO as called for in its business plan; and would have been able to address: (i) the deterioration of Superior's business in the GOM and the huge cost overruns with the refurbishment of the *Superior Endeavour*;  and (ii) its receivable dispute with BPTT resulting from Superior's known lack of accounting and project management controls.  Moreover, Superior would not have been forced to obtain alternative financing after its 2Q07 financial results were disclosed.

65. Indeed, in settling the BPTT receivable for just a little over $11 million -- which Superior claimed had grown to $24 million at the date of its bankruptcy -- the Plan Agent, who had done extensive due diligence on this claim testified that Superior's accounting controls were so dysfunctional Superior could not justify a larger amount stating that Superior "lacked [an] effective purchase order management system and clearly indentified levels of authority [for purchasing goods] . . . no functional job cost accounting system [ etc.] . . . . [which] impacted the Company's ability to control the financial aspects of this project". In addition, the Plan Agent also testified that there were multiple incidents of improper billing, double billing, substitute invoices not reflected in accounting system which further undermined Superior's claim.

66. As a proximate result of its undercapitalization, Superior was forced to seek bankruptcy protection one year and four days following its IPO. The Defendants' breaches of the fiduciary duty of care caused a complete loss of the enterprise value of Superior exceeding $385 million at the time of the IPO according to documents prepared by the underwriters in valuing Superior in connection with its IPO.

67. Mermis and Burks further breached their fiduciary duty of care and were grossly negligent when they: (i) failed to pursue other offers for the *Superior Achiever*; and (ii) failed to inform Superior's Board of Directors of the significant interest in, or bona fide offers for, the *Superior Achiever* before and after the letter of intent to sell the *Superior Achiever* to Hornbeck was signed on December 14, 2007. Had they done so, given: (i) the significant interest in purchasing the *Superior Achiever* by other parties -- including at least one party who knew the terms of the sale to Hornbeck; and (ii) the fact that the *Superior Achiever's* fair market value materially exceeded Hornbeck's offer, Superior's Board of Directors would have quickly

initiated a bidding process which would have maximized the consideration being paid for the *Superior Achiever*.

68.     As a proximate result of Mermis' and Burks' breaches of the fiduciary of care with respect to the sale of *Superior Achiever*, Superior was damaged by the lost consideration resulting from the $17 million below fair market value price paid for the *Superior Achiever*, the $5.5 million contract termination penalty/writeoff, and the lost $2.9 million currency hedge benefit in an amount of not less than $25.4 million.

**COUNT II**
**Breach of Fiduciary Duty – Duty of Loyalty and Good Faith**

69.     Plaintiff realleges paragraphs 1 through 68.

70.     The Defendants breached their fiduciary duties of loyalty and good faith to Superior when: (i) at the April 16, 2007 board meeting they approved the $28 million special dividend to Schaefer and Schaefer Holdings LP; and (ii) at the April 19, 2007 board meeting they "upsized" the IPO by 1.5 million shares giving 100 percent of that benefit as well as 100 percent of the benefit of selling an additional 225,000 shares in the over-allotment option to Schaefer and Schaefer Holdings -- a benefit exceeding $21 million given at the expense of Superior.

71.     Defendants Mermis, Koch, and Burks were not independent as they acted at the instruction of Schaefer who decided "how much he want[ed] out of the Company."   In addition, Schaefer, Mermis and Koch acted in their own self-interests as each received a financial benefit from these transactions by virtue of their direct interests and/or interests in Schaefer Holdings. For the same reasons discussed in detail above, the Defendants also consciously disregarded their fiduciary duties of loyalty and good faith and materially undercapitalized Superior by giving Schaefer and Schaefer Holdings the $28 million special dividend and the benefit of the upsized

IPO as well as the over-allotment option -- while leaving Superior a mere $17.9 million from the IPO and far below the $45 million Superior required to execute its business plan.

72.     Due to the Defendants' actions as set forth above, Superior was grossly undercapitalized.  As a proximate result of its undercapitalization, Superior was forced to seek bankruptcy protection one year and four days following its IPO.  Thus, the Defendants' breaches of their fiduciary duty of loyalty and good faith caused a complete loss of Superior's enterprise value which exceeded $385 million at the time of the IPO.

73.     Mermis and Burks also breached their fiduciary duty of loyalty and good faith in connection with the sale of the *Superior Achiever* to Hornbeck when they consciously disregarded their fiduciary duties and: (i) failed to pursue other offers for the *Superior Achiever*; and (ii) failed to inform Superior's Board of Directors of the significant interest in, or bona fide offers for, the *Superior Achiever* before and after the letter of intent to sell the *Superior Achiever* to Hornbeck was signed on December 14, 2007.  Had they done so, given: (i) the significant interest in purchasing the *Superior Achiever* by other parties -- including at least one party who knew the terms of the sale to Hornbeck; and (ii) the fact that the *Superior Achiever's* fair market value materially exceeded Hornbeck's offer, Superior's Board of Directors would have quickly initiated a bidding process which would have maximized the consideration being paid for the *Superior Achiever*.

74.     As a result of Mermis' and Burks' breaches of the fiduciary of loyalty and good-faith, Superior has been proximately damaged by the lost consideration resulting from the $17 million below fair market value price paid for the *Superior Achiever*, the $5.5 million contract termination penalty/writeoff, and the lost $2.9 million currency hedge benefit in an amount of not less than $25.4 million.

## COUNT III
## Self Dealing, Waste of Corporate Assets and Diversion of Corporate Opportunity

75.    Plaintiff realleges paragraphs 1 through 74.

76.    As alleged above, the Defendants were not independent and acted for the benefit of Schaefer, Koch and Mermis and not Superior. The payment of the $28 million special dividend to Schaefer and Schaefer Holdings LP (in which Schaefer, Mermis, and Koch were limited partners) and the authorization of the "upsized" the IPO by 1.5 million shares and giving 100 percent of that benefit as well as 100 percent of the benefit of selling an additional 225,000 shares in the over-allotment option to Schaefer and Schaefer Holdings -- benefits which exceeded $21 million -- constituted self dealing as Schaefer, Mermis, and Koch stood on both sides of these transactions and stood to personally benefit from them.

77.    Superior received no reasonable benefit and/or consideration from the Defendants' diversion of these additional stock sales on the IPO and the approval of the special dividend out of the IPO proceeds.  These actions which resulted in a transfer of over $49 million in property from Superior to Defendants Schaefer, Mermis and Koch and made no economic sense given Superior's business plan and known financial condition and prospects as discussed above.

78.    The Defendants' decisions at the April 16th and 19th board meetings authorizing those transactions -- which no reasonable director would have approved -- constituted a clear waste of corporate assets and diversion of corporate opportunity which should be returned to Superior.

## COUNT IV
## Insider Trading

79.    Plaintiff realleges paragraphs 1 through 78.

80.     Mermis, Koch, and Burks filed their Rule 10b5-1 trading plans to begin selling all of their personal holdings in Superior that were eligible for sale on October 25, 2007 while in possession of undisclosed material adverse information. As described above, such undisclosed material adverse information included the facts that: (i) Superior was facing huge liquidity issues and was "looking at a cash flow problem"; (ii)  Superior was so short of cash it had to use the Fortis loan to fund its operations which left insufficient funds to allow for the completion of the *Superior Achiever*, and it did not have the cash to pay its contractual commitments to Subtech; (iii) Superior was projected to be unable to meet the JP Morgan's lowered Fixed Charge Coverage Ratio covenant of .8 - 1.0 from 1.0 - 1.2 for 3Q07; (iv) Superior's poor financial management had caused it to improperly use $20 million in foreign receivables as collateral on Superior's credit line with JP Morgan; and (v) Superior faced a potential tax liability exceeding $10 million.

81.     Pursuant to those Rule 10b5-1 trading plans, Defendant Mermis sold over $980,000 in stock; Defendant Burks sold over $558,000, and Koch sold over $2.9 million.  All of these ill-gotten gains should be disgorged to Superior.

## Attorney's Fees

82.     Superior requests an award of his reasonable fees and costs pursuant to applicable law.

## Request for Pre- and Post-Judgment Interest

83.     Superior seeks pre-judgment interest on all damages from the date of accrual through the date of judgment at the rate of 5% per annum.  Superior seeks post-judgment interest on all money damages awarded hereunder from the date of judgment until paid at the prevailing federal judgment rate.

84.     Accordingly, Superior requests the Court to enter judgment against the Defendants as set forth above for damages caused to Superior by their misconduct and to grant such other relief as is just.

**Dated: March 16, 2011.**

Respectfully submitted,

**Klafter Olsen & Lesser LLP**

By:     /s/ Kurt B. Olsen
        Kurt B. Olsen
        (Admitted Pro Hac Vice in main case)
        1250 Connecticut Ave. NW, Ste. 200
        Washington DC 20026
        (202) 261-3553
        (202) 261-3533 (Facsimile)

        Jeffrey Klafter
        (Admitted Pro Hac Vice in main case)
        Two International Drive, Ste 350
        Rye Brook, NY 10573
        (914) 934-9200
        (914) 934-9220 (Facsimile)

        *Litigation Counsel to the Post-Confirmation Equity Committee in Superior Offshore International, Inc.*

**Porter Hedges LLP**

By:     David R. Jones
        State Bar No. 00786001/S.D.Tex. No. 16082
        Joshua W. Wolfshohl
        State Bar No. 24038592
        1000 Main, 36th Floor
        Houston, Texas 77002
        (713) 226-6000
        (713) 226-6253 (Facsimile)

        *Counsel to the Plan Agent*